## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 18 2017, 5:50 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT
A.P. (MOTHER)

Danielle L. Gregory
Indianapolis, Indiana


ATTORNEY FOR APPELLANT
A.P. (FATHER)

Steven J. Halbert
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Matter of: N.P., L.P., B.P., and C.P, (Minor Children), A.P. (Mother) and A.P. (Father), *Appellants-Respondents,* <br><br> v. <br><br> The Indiana Department of Child Services, *Appellee-Petitioner* | August 18, 2017 <br><br> Court of Appeals Case No. 49A04-1703-JC-446 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Marilyn J. Moores, Judge <br><br> Trial Court Cause No. 49D09-1608-JC-3164 49D09-1608-JC-3165 49D09-1608-JC-3166 49D09-1608-JC-3167 |

**Vaidik, Chief Judge.**

# Case Summary

As.P. ("Mother") and Au.P. ("Father") have four children, who were removed from the family home after the Department of Child Services (DCS) received a report of neglect. DCS alleged that the children were in need of services (CHINS) because of the conditions at the home. Mother and Father contested the allegations, and a fact-finding hearing was held. During the hearing, DCS introduced evidence, over Mother's and Father's objections, regarding the parents' mental health, which was not part of the petition. Mother and Father presented evidence that they had remedied the housing situation. Nevertheless, the trial court adjudicated the children CHINS. Mother and Father appeal, arguing that they were not placed on notice to defend mental-health allegations and that even if the mental-health evidence was properly admitted, the evidence is insufficient to support the adjudications. We agree and reverse.

# Facts and Procedural History

Mother and Father have four children: N.P., born in January 2009; L.P., born in June 2010; B.P., born in January 2012; and C.P., born in July 2013. During August 2016, Mother and Father struggled to pay their bills and sought out financial help from community organizations, but they were unsuccessful in getting the aid the family needed. On August 23, Marion County DCS received a report of child neglect, alleging that Mother and Father did not have running

water in their home.  Korrie Frick, an assessment manager with DCS, went to the home to investigate the report and found that the house did not have running water, had a strong odor of urine and feces, and had only one twin bed for the four children.  Father told Frick that he and Mother had been involved with Indiana DCS in the past, as well as Child Protective Services (CPS) in New Mexico, but all of the claims were unsubstantiated.  Frick informed Father that she would be back the following day to interview the children.  Frick did not seek to have the children removed from the home at that time because there were not "any immediate safety concerns facing the children."  Tr. p. 14.

[3]     At some point after Frick's initial visit, Mother transported the children to a relative's home in Pennsylvania, so when Frick returned to the house the following day, the children were not there.  Having learned that the children were now residing out of state, DCS petitioned the trial court to give DCS permission to take the children into custody and for the court to declare the children CHINS.  DCS alleged, under Indiana Code section 31-34-1-1, that the children were CHINS because:

> The [children's] physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the [children's] parent, guardian, or custodian to supply the [children] with necessary food, clothing, shelter, medical care, education, or supervision; and the [children] need[] care, treatment, or rehabilitation that the [children are] not receiving; and is unlikely to be provided or accepted without the coercive intervention of the Court.

*****

This petition is based upon, and is supported by, the following alleged material facts:

a. [Mother] and [Father], parents of [N.P.], [L.P.], [B.P.], and [C.P.], have failed to provide the children with a safe, stable, and appropriate living environment.

b. The home was observed to be unsanitary and cluttered with a strong odor of animal feces.

c. There was also no working water in the home, and all four children share one twin size mattress.

d. [Mother] reportedly left with the children, and [DCS] is unable to ensure their safety in her care.

e. The children and family are in need of services they are not receiving and are unlikely to receive without the DCS' and the Court's involvement, and the coercive intervention of the Court is required to ensure the children's safety and well being.

Appellants' App. p. 42.[1]

[4] On August 25, the trial court issued a preliminary order declaring the children CHINS and granted DCS's request to take custody of the children. The court ordered the parents to return the children to Indiana by 5:00 p.m. on August 26. Because the children had been moved out of state, the court also ordered

---

[1] Mother and Father are represented by separate attorneys on appeal, and each filed a separate appendix. However the appendices appear to be duplicates. Accordingly, their filings will be cited as one appendix: Appellants' Appendix.

Mother and Father to have supervised visits with the children. The court further ordered Mother and Father to comply with all DCS recommendations, which included home-based therapy and home-based case management. Home-based case management is used to help families maintain their housing, find employment, and budget their money. Tr. p. 17. The home-based case-management service provider also served as the supervisor for the parents with the children.

[5] Mother and Father were unable to get the children back to Indiana by the deadline, so Frick flew to Pennsylvania to retrieve them. The children were originally placed in a foster home in Gary because no foster home in the Indianapolis area could take them. Three weeks later, DCS was able to move the children to a foster home in Indianapolis. When the children arrived in Indianapolis, it was discovered that they had lice.

[6] Mother and Father contested the petition and preliminary order declaring the children CHINS. A fact-finding hearing was held on November 29, 2016. During the hearing, the court heard testimony that Mother and Father had moved to a new apartment, that Father had been working since the beginning of September, and that Mother had been working for a voter-registration group, although her employment had ended on election day, November 8. The new apartment had two bedrooms, and two children would sleep in each room, with Mother and Father sleeping in the living room. Rent, including utilities, was $275 per week, which Father's paycheck covered. Mother and Father had beds for all four children, all utilities were working, and there was ample food in the

house. Under DCS's standards, the apartment was "small" but "appropriate." *Id.* at 31, 38, 46. Mother and Father found the apartment without DCS's assistance.

[7] Regarding employment, Father had started a job at a local distribution center, working from 8:00 a.m. to 4:00 p.m. Father located and obtained his employment without DCS's help. In fact, Father was waiting on the results of a pre-employment drug screen and background check when DCS began its investigation into the family. Based on her supervisor's feedback, Mother had been hopeful that she would be hired on full-time with the voter-registration group, but no employment offer was made. At the time of the hearing, she had been out of work for three weeks but had multiple job leads. She was "trying to find a job that works different hours than my husband so that we can parent our children" and eliminate the need for childcare expenses. *Id.* at 58.

[8] The home-based caseworker stated that she supervised Mother's and Father's visits with the children and that Mother is "bonded with the kids, she's nurturing, she's empathetic, she's engaged in her visits from start to finish. . . . I don't have any concerns of – with regards to safety." *Id.* at 48. She stated that Father was "relaxed" during the Thanksgiving visit with the children and could have been more hands-on. *Id.* at 43-44. She also testified that Mother and Father were inconsistent with their visits. Visits were set up for twice a week: four hours on Sundays and eight hours on Tuesdays. However, the Tuesday visitation schedule overlapped with Mother's and Father's work schedules.

Recognizing the conflict, DCS permitted the parents to have phone calls with the children, but Mother and Father called only once.

[9] During a home-based case-management session, Mother disclosed that she had been diagnosed with mental-health issues: bi-polar disorder, ADD, PTSD, and dissociative disorder. She also disclosed that she had not seen a doctor about these issues in over two years and was self-medicating with marijuana. The home-based caseworker testified to Mother's mental-health issues in relation to Mother's concerns that they would be a hurdle for finding employment. Neither Mother nor Father objected to this testimony.

[10] The home-based caseworker also testified that Mother told her that Father had also been diagnosed as bi-polar, a statement Mother denied making. Both the family case manager and the home-based caseworker testified about Mother's and Father's mental health and how it impacted their parenting. During this testimony, both Mother and Father objected:

> [T]here's nothing in the petition indicating mental health issues of the parents[.] . . . The petition really only focuses on the issue of the home and employment. This case has been open since August, the Department could have moved to amend that petition so we would be on notice for that argument.

*Id.* at 22-23; *see also id.* at 39. The trial court overruled the objections.

[11] At the conclusion of the hearing, the trial court affirmed its preliminary order and declared the children CHINS. It entered findings to support its order, which include:

9. Parents had prior CPS involvement while they lived in New Mexico[2] and had numerous prior [un]substantiated[3] reports of dirty homes and educational neglect of the children.

*****

14. Mother told her homebased case manager Monica Lawrence that she has been diagnosed with bi-polar disorder, dissociative disorder, attention deficit disorder and PTSD and that she has not been seen by a psychiatrist in 2.5 years. Mother stated that she thought these conditions might be an impediment to employment. She also told Ms. Lawrence she was self medicating with marijuana and had consumed such less than two (2) weeks prior to their meeting. Mother also stated Father had bi-polar disorder.

15. Father is employed at [a distribution] warehouse, but his income alone is insufficient to sustain all the family's needs.

*****

17. The parents have demonstrated a history of employment and housing instability, as well as untreated mental health issues and the children's physical or mental conditions are seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the children's parents to supply the children with necessary food, clothing, shelter, medical care, education, and supervision; and the children need care [and] treatment[] that

[2] No evidence was introduced during the fact-finding hearing regarding Mother's and Father's involvement with CPS in New Mexico other than Father's statement to DCS manager Frick.

[3] The original finding read "numerous prior substantiated reports." On appeal, DCS acknowledges that this was a scrivener's error because no evidence was presented showing that any prior claims of abuse or neglect were substantiated. Appellee's Br. p. 29.

they are not receiving; and are unlikely to be provided or accepted without the coercive intervention of the Court.

Appellants' App. pp. 93-94. The court also entered a dispositional decree, in which Mother and Father were ordered to continue with home-based therapy, provide random drug screens, and undergo a psychological evaluation. *Id.* at 108-09. Father was also ordered to participate in the Father Engagement Program, *id.* at 108, and Mother was ordered to continue with home-based case management, *id.* at 109.

[12] Mother and Father both appeal.

# Discussion and Decision

[13] Mother and Father contend[4] that the trial court erred in adjudicating the children CHINS because DCS did not amend its petition to include mental-health allegations, and the evidence is insufficient to support the trial court's order.

[14] To prove a CHINS allegation, DCS must show, by a preponderance of the evidence, that: (1) the children are under the age of eighteen; (2) one of eleven different statutory circumstances exists that would make the children CHINS; and (3) the children need care, treatment, or rehabilitation that they are currently not receiving and are unlikely to be provided or accepted without the

---

[4] Mother and Father filed separate briefs on appeal. We consolidate their arguments and address them as one.

coercive intervention of the court. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012); *see* Ind. Code §§ 31-34-1-1 to -11. Here, the trial court adjudicated the children CHINS under Section 1, which states in part:

> A child is a child in need of services if before the child becomes eighteen (18) years of age [] the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision[.]

Ind. Code § 31-34-1-1(1).

# I. Mental-Health Evidence

[15]    Mother and Father argue that they were never put on notice that they needed to defend allegations regarding their mental health.[5] Mother and Father contend that the CHINS petition was based solely on the conditions of the house and that DCS should have amended its petition if it wanted to include mental-health issues. In response, DCS contends that Mother and Father did not timely object to testimony about their mental health and have waived the issue under Indiana Trial Rule 15(B).

[16]    A CHINS petition, in part, must contain "[a] concise statement of the facts upon which the allegations are based, including the date and location at which

---

[5] Mother and Father also argue that the evidence regarding their mental health was improperly admitted during the fact-finding hearing because it was based on hearsay statements. Because we find that the evidence was improperly admitted on other grounds, we do not address this argument.

the alleged facts occurred." Ind. Code § 31-34-9-3(C). "Presumably, these provisions were enacted to give the child's parent, guardian or custodian notice of the allegations and the opportunity to contradict the [DCS] case." *Maybaum v. Putnam Cty. Office of Family & Children*, 723 N.E.2d 951, 954 (Ind. Ct. App. 2000); *see also* Ind. Code § 31-32-2-3 (stating that in CHINS proceedings a parent is entitled to cross-examine witnesses, obtain witnesses or tangible evidence by compulsory process and to introduce evidence on his behalf). "Therefore the CHINS petition is an integral part of ensuring that the parents have notice of the allegations and an opportunity to contradict [DCS's] evidence." *Id.*

[17]    However, parties may expressly or impliedly consent to trying the unpled issue under Indiana Trial Rule 15(B), which is applicable in CHINS proceedings.[6] The rule states, in relevant part, "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Ind. Trial Rule 15(B). If a party raises an objection at trial on the grounds that the evidence is not within the pleadings, the court "may allow the pleadings to be amended" or "may grant a continuance to enable the objecting party to meet such evidence." *Id.*

[18]    Upon review of the record, at no time did DCS expressly inform Mother or Father that it would deviate from the CHINS petition and include evidence of

---

[6] Indiana Code section 31-32-1-3 states that "the Indiana Rules of Trial Procedure apply in all matters not covered by the juvenile law."

the parents' mental-health status. Accordingly, DCS could only raise the issue at the hearing if Mother and Father impliedly consented. DCS argues that Mother and Father did consent because no objection was raised during the family case manager's testimony that Mother was referred to home-based therapy because she disclosed a history of mental-health problems. *See* Tr. p. 18. However, a few minutes later, when the family case manager brought up the parents' mental health as a reason why the children should be adjudicated CHINS, Father's attorney objected, "I'm going to, sorry for interrupting after letting her talk for a while, but I was looking at the petition and there's nothing in the petition indicating mental health issues of the parents are the basis for CHINS[.]" *Id.* at 22. Mother's attorney joined the objection. Furthermore, when the home-based caseworker mentioned the parents' mental health as a reason for continued supervised visits, the parents again objected to the testimony. *See id.* at 39-40.

[19] While DCS is correct in its assertion that neither parent objected when the family case manager first brought up the issue of mental health, we find that this testimony is readily distinguishable from the later testimony. The initial testimony specifically dealt with the services that DCS was providing Mother and Father; it did not go into why the court should adjudicate the children CHINS like the later testimony did. Mother and Father did not impliedly consent to their mental health being tried.

[20] DCS further contends that the court properly admitted the mental-health testimony because the court is to consider "the family's condition not just when

the case was filed, but also when it [was] heard." Appellee's Br. p. 19 (quoting *In re S.D.*, 2 N.E.3d 1283, 1290 (Ind. 2014)). While we agree that the court is to consider the family's condition at the time of trial, this does not circumvent our notice requirements. DCS has an obligation to amend its pleadings to include any new allegation(s) that arise between the initial hearing and the fact-finding hearing. Mother and Father were not properly notified that they needed to defend against mental-health allegations during the fact-finding hearing. Because of this, the court erred when it permitted DCS's witnesses to testify about the parents' mental health.

## II. Sufficiency of the Evidence

[21] Mother and Father also argue that the evidence is insufficient to support the CHINS ruling. They contend that the issue stated in the petition—substandard housing—was cured by the time of the fact-finding hearing, and therefore, the children should have been returned to their care. When the trial court enters findings of fact and conclusions, we apply a two-tiered standard of review. *Matter of D.P.*, 72 N.E.3d 976, 979 (Ind. Ct. App. 2017). We first determine whether the evidence supports the findings, and then determine if the findings support the judgment. *Id.* at 980. We do not reweigh the evidence or reassess witness credibility and will consider only the evidence favorable to the trial court's judgment. *Id.* at 979.

[22] The CHINS petition alleged that the children needed to be removed from the home because Mother and Father "have failed to provide the children with a

safe, stable, and appropriate living environment." Appellants' App. p. 42. The petition further stated that the home smelled of urine and feces, had no running water, and "all four children share one twin size mattress." *Id.* Despite these allegations, DCS manager Frick stated that she did not feel the need to remove the children from the home after her first visit because there was no immediate threat to the children's safety. Tr. p. 14. The children were only removed after DCS learned that Mother had transported the children to relatives living out of state. Shortly thereafter, both Mother and Father were employed and had moved to a new apartment. The new home had working utilities, food, and beds for all four children. Under DCS's standards, the apartment was "small" but "appropriate." *Id.* at 31, 38, 46.

[23] When questioned about any on-going safety concerns for the children, the family case manager only mentioned the parents' ability to financially support the children. "[T]here was no electricity, I mean – I'm sorry, water and the house was very filthy and there were – I'm concerned about their employment, so for them to be able to maintain stable housing. The children had lice twice." *Id.* at 25-26. We do not share these concerns. DCS did not present any evidence that the children contracted lice from the parents' home. Rather, the timing of the lice discoveries is such that the children may have contracted the lice while in DCS's custody. Furthermore, Mother and Father were able to pay rent based solely on Father's income, as he was the only one working at the time of the hearing, and the parents had moved to an apartment that was satisfactory under DCS's standards. We must be very careful not to adjudicate

children as CHINS "because the parents in question do not fit into a class-based notion of what a parent should be. The judiciary, prosecutors and the personnel in the welfare departments should not enforce their personal standards on those who are less well off." *Matter of D.T.*, 547 N.E.2d 278, 285 (Ind. Ct. App. 1989) (citing *Matter of Dull*, 521 N.E.2d 972, 977 (Ind. Ct. App. 1988) (Sullivan, J., dissenting)).

[24] DCS argues that the parents need the coercive intervention of the court for the children to get the services they need. We disagree. To support its contention, DCS points to the fact that the parents were unsuccessful in obtaining aid from local resources, that Mother took the children to Pennsylvania to live with relatives, and that Mother self-medicates for her mental-health issues. Before DCS's involvement, Mother and Father recognized that they needed financial help and sought aid from local resources. If anything, this is an example of Mother and Father doing what is necessary for their family **without** the coercive intervention of the court. Mother's decision to move the children out of state after Frick's first visit was ill-advised. Nevertheless, the children were returned to Indiana, and DCS was able to complete its initial investigation. None of DCS's concerns about the children or their safety in Mother's care were substantiated. When specifically questioned about concerns she had for the children's safety while with Mother, the home-based caseworker stated, "I don't have any concerns of – with regards to safety." Tr. p. 48. DCS has failed to show why the continued coercive intervention of the court is necessary.

Accordingly, we find that the evidence does not support the trial court's order and reverse the CHINS adjudications.

[25] Reversed.

Mathias, J.,and Crone, J., concur.